IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

VINCE MCNATT,

       **Plaintiff,**

       v.

       Civil Action 2:19-cv-5503
       Magistrate Judge Elizabeth P. Deavers

OHIO DEPARTMENT OF JOB AND
FAMILY SERVICES,

       **Defendant.**

## OPINION AND ORDER

With the consent of the parties and by Order of Reference (ECF No. 10), pursuant to 28 U.S.C. § 636(c), this matter is before the Court for consideration of Defendant's Motion for Summary Judgment. (ECF No. 42 (the "Motion").) The Motion has been fully briefed and is ripe for review. (*See* ECF Nos. 79-85.) For the following reasons, the Motion (ECF No. 42) is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

Plaintiff, an African American male who is also a disabled veteran, has worked for Defendant Ohio Department of Job and Family Services ("ODJFS") since 2006. (ECF No. 42 at PAGEID # 1119.) Plaintiff is currently employed as a Grants Coordinator 1. (*Id.*) On June 24, 2018, Plaintiff applied for a promotion to Grant Administrator. (*Id.* at PAGEID ## 1119-1122.) Plaintiff was one of three candidates for the position, but was the only African American candidate. (*Id.* at PAGEID # 1122.) Each candidate was interviewed by Scott France, the previous Grant Administrator, and Julie Wirt, the Bureau Chief over the ODJFS Office of Workforce Development ("OWD") Employment and Training Program Management at the time.

(*Id.* at PAGEID ## 1119, 1122.) All three candidates were asked the same set of predetermined questions. France and Wirt evaluated the candidates' answers to those questions relative to an answer key developed prior to the interviews. (*Id.* at PAGEID # 1122.) Then, after the interviews, France and Wirt decided to re-score all three candidates' answers. (*Id.*) After the candidates' interview responses were re-scored, Raye Riley, a white female, was offered the job as the interviewee with the highest score. (*Id.* at PAGEID ## 1122-1123.) Riley accepted the job and is currently the Grants Administrator. (*Id.*) In that role, Riley serves as Plaintiff's direct supervisor. (*Id.* at PAGEID # 1120.)

On August 23, 2018, after Riley was hired, Plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission. (ECF No. 45 at PAGEID # 1223.) After Plaintiff filed his charge of discrimination, Riley implemented new (shorter) deadlines for work that Plaintiff believed were unrealistic. (*Id.*) A few months later, Plaintiff requested to take a certain training, but Riley denied his request. (*Id.*) Additionally, at some point after Riley was hired, the former Deputy Director of OWD John Weber asked Plaintiff in a meeting whether he had completed a mandatory training. (ECF No. 42 at PAGEID # 1117.) As a result, on August 5, 2019, Plaintiff filed a retaliation charge related to the events after Riley was hired. (*Id.* at PAGEID # 1125.)

On December 18, 2019, Plaintiff filed the subject action. (ECF No. 1.) Shortly thereafter, on January 14, 2020, Plaintiff amended his complaint. (ECF No. 6.) On September 24, 2020, Plaintiff filed the Second Amended Complaint which serves as the operative complaint. (ECF No. 18.) In the Second Amended Complaint, Plaintiff alleges that ODJFS' hiring policies disparately impact African American males, and that ODJFS subjected Plaintiff to disparate treatment and discriminated against him by hiring Riley as the Grants Administrator. (*Id.*) Plaintiff also alleges that after Riley became the Grants Administrator, ODJFS retaliated

against Plaintiff for filing the discrimination charge. (*Id.*) On August 26, 2021, ODJFS filed the subject Motion. (ECF No. 42.) On October 7, 2021, Plaintiff filed a response in opposition to the Motion, and on November 18, 2021, ODJFS filed a reply brief. (ECF Nos. 45, 48.) The subject Motion is thus ripe for judicial review.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of proving that no genuine issue of material fact exists falls on the moving party, "and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stransberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, 439 F. App'x 492, 495-496 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however 'do more than simply show that there is some metaphysical doubt as to the material facts,'. . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a 'genuine' dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (citations omitted).

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (internal citation omitted). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stransberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

### III.  ANALYSIS

In his Second Amended Complaint, Plaintiff asserts three causes of action against ODJFS, each arising under Title VII of the Civil Rights Act of 1964:  (1) disparate impact race discrimination; (2) disparate treatment race discrimination; and (3) retaliation.  (ECF No. 18.)[1] The Court will discuss each in turn.

**A.  Count One: Disparate Impact**

Title VII proscribes "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).  Title VII also requires "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of race or other impermissible classification." *Id.*  Discrimination occurs when an employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and fails to demonstrate that the challenged practice is job related

---

[1] In a footnote, ODJFS observes that the Second Amended Complaint "references [Plaintiff's] sex, military service, and disability, but does not plead discrimination on such bases."  (ECF No. 42 at PAGEID # 1125, n.3.)  Plaintiff does not appear to dispute this assertion.  (*See generally* ECF No. 45.)  Accordingly, the Court construes Plaintiff's discrimination claims as being limited to the basis of race.

for the position in question and consistent with business necessity . . . ." *Dunlap v. Tennessee Valley Auth.*, 519 F.3d 626, 629 (6th Cir. 2008) (citing 42 U.S.C. § 2000e–2(k)(1)(A)(I)). Under this theory, "proof of discriminatory intent is not required." *Id.* (citing *Griggs*, 401 U.S. at 432). As the Sixth Circuit has explained, courts apply a three-part, burden shifting test to determine whether an unlawful disparate impact exists in a particular case:

> First, the plaintiff must establish a prima facie case of discrimination—i.e., the plaintiff must establish that an adverse impact has occurred. If he succeeds, the employer must show that the protocol in question has "a manifest relationship to the employment"—the so-called "business necessity" justification. *Griggs,* 401 U.S. at 431, 91 S.Ct. 849. The plaintiff must then show that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect. [*Albemarle Paper Co. v. Moody,* 422 U.S. at 425, 432, 95 S.Ct. 2362 (1975).]

*Id*.

A plaintiff can establish a prima facie case of disparate impact by identifying and challenging a specific employment practice, and then showing an "adverse effect" by offering statistical evidence "of a kind or degree sufficient to show that the practice in question caused the" adverse effect in question. *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 908 (6th Cir. 1991) (citation omitted). If a prima facie case is established, then the defendant must articulate a legitimate business reason for the employment practice. *Id.*; *see also* 42 U.S.C. § 2000e2(k)(1)(A)(i) (an employer has the burden to show that the policy is "job related for the position in question and consistent with business necessity"). Finally, if the defendant can establish a business necessity, then the burden shifts back to the plaintiff to show that there exists an alternative employment practice that would achieve the same business ends with a less discriminatory impact. *Scales*, 925 F.2d at 908; *see also* 42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C).

Here, ODJFS argues that Plaintiff's disparate impact claim fails for multiple reasons. First, ODJFS challenges whether Plaintiff can establish either of the two prongs of a prima facie

5

case, arguing that Plaintiff "has not alleged a sufficiently specific employment practice" and that even if he had, "his disparate impact claim cannot succeed because he cannot produce a statistical analysis suggesting any aspect of OWD's hiring process has a disproportionately negative impact on individuals of a specific protected classification." (ECF No. 42 at PAGEID ## 1126-1129.) As to the first prong, ODJFS argues that Plaintiff alleges that "the ORAL INTERVIEW Administration Guide and Scoring . . . used by the [OWD] development has a disparate impact on African Americans," but ODJFS counters that it "is not aware of a document by such a title." (*Id.* at PAGEID # 1127.) ODJFS argues that "not all vacancies in the OWD are filled using an oral interview," and submits that "[Plaintiff's] general reference to '[t]he ORAL INTERVIEW Administration Guide and Scoring' is not sufficiently specific to meet the first prong of a prima facie case of disparate impact." (*Id.*) ODJFS also emphasizes the "multiple discrete steps in the creation and administration of oral interviews" to argue that its process is "separable both based upon steps, and responsible parties." (*Id.* at PAGEID ## 1127-1128.)

As to the second prong, ODJFS argues that Plaintiff "has not collected or produced data regarding the percentage of African Americans in a particular position, let along the qualified local labor force or applicant pool," so "he cannot provide the required statistical analysis." (*Id.*) ODJFS recognizes Plaintiff's allegation that "in 88 counties only one African American has scored high enough to be placed in a Management role," but argues that "the record disproves this allegation" and "[e]ven if he were qualified to draw a statistical conclusion from this alleged fact, it would be insufficient." (*Id.* at PAGEID # 1129.)

In response, Plaintiff maintains that he has "properly identified and challenged an ODJFS policy and proved it adversely affected African American males." (ECF No. 45 at PAGEID # 1228.) Plaintiff argues that he properly "identified the administrative guide used in the oral

interview process as the specific employment practice." (*Id.* at PAGEID # 1229.) Plaintiff further argues that "[a]lthough the ODJFS interviews may be conducted by different hiring managers that rely on their own subjectivity to score the candidates, the interviewers are instructed how to score the interviews from the same administrative guide and are not allowed to utilize their own priorities." (*Id.* at PAGEID # 1230.) Plaintiff believes that "[i]n essence, the oral interviews follow the same administrative guide and this is the specific employment practice [Plaintiff] has identified as discriminatory." (*Id.*) And as for the second prong, Plaintiff notes that there are 65 management positions in the OWD, only 11 are held by African Americans, and only 2 are held by African American men. (*Id.*) Plaintiff thus concludes that "only 3.08% of management positions at ODJFS are held by African American males." (*Id.*)

In its Reply brief, ODJFS maintains that "there is no document by [the] exact title" provided by Plaintiff, and argues that "[b]y failing to explain why the Department's hiring process is not separable into discrete employment practices, [Plaintiff] has failed to identify a specific employment practice to be challenged." (ECF No. 48 at PAGEID ## 1246-1247.) ODJFS also rejects Plaintiff's statistical analysis, arguing that Plaintiff "has not provided any information about the number of African American applicants for supervisory positions versus the number of African Americans in those positions." (*Id.* at PAGEID # 1246, n.1.)

The Court finds ODJFS' arguments to be well taken and agrees that Plaintiff has failed to prove his prima facie disparate impact claim. Regarding the first prong, the Court does not share ODJFS' concern that Plaintiff may have alleged the wrong title for the subject "employment practice." It is clear to the Court that Plaintiff is referring to the administrative guide, with the accompanying assessment tool, that ODJFS uses for oral interviews. Plaintiff provides ample support to this end from the deposition of Amber Shedd, the Human Capital Management Senior

7

Analyst for ODJFS. (ECF No. 41 at PAGEID # 1037.) As Ms. Shedd testified during her deposition, the administrative guide "include[s] how to schedule candidates for an interview, any type of script that needed to be read to the candidates before the assessment is to be administered, any types of scoring guidelines, guidelines that is to be used for any of the assessments, things of that nature." (*Id.*) By its nature, this administrative guide may not have an official title, but the Court is confident that no ambiguity exists regarding the practice about which Plaintiff complains.

That said, the Court disagrees with Plaintiff's argument that the administrative guide constitutes a discrete "employment practice" for purposes of establishing a prima facie disparate impact claim. To this end, the Sixth Circuit has explained that "the starting point of [the] § 2000e-2(k) analysis is . . . **something that the employer does**," which "**cannot be the hiring system itself**, since § 2000e-2(k)(1)(B)(i) distinguishes an 'employment practice' from 'a respondent's decisionmaking process.'" *Davis v. Cintas Corp.*, 717 F.3d 476, 496 (6th Cir. 2013) (emphasis added). From that starting point, the Sixth Circuit found that a plaintiff "must identify one specific step of [a hiring process] as a particular employment practice, rather than pointing to a group of steps that share a common characteristic." *Id.*

Here, as discussed, Plaintiff has alleged that the ODJFS' administrative guide is the employment practice for purposes of the disparate impact analysis. But, as Ms. Shedd's testimony and subsequent sworn declarations confirm, the administrative guide essentially amounts to a protocol for "the [ODJFS'] hiring system itself," which cannot be an employment practice for purposes of the disparate impact analysis as a matter of law. *Davis*, 717 F.3d at 496. For intance, Ms. Shedd's testimony shines light on just how individualized a given hiring decision is. First, by way of example, Ms. Shedd testified that a hiring manager needs to

8

determine whether the hiring process will be performed by written test or an oral interview – or by some combination of the two.  (ECF No. 42-1 at PAGEID # 1142, ¶ 6 ("Testing devices are typically *either* an oral interview with predetermined questions, *or* it is a written test.") (emphasis added); ECF No. 41 at PAGEID ## 994 ("Once we have identified the position description, we would the begin working on developing a test tool, which could either be an oral interview or a written assessment or both"); 1000 ("Test tools could include a written assessment or an oral interview or a combination of both").)  Ms. Shedd also confirmed that the type of questions that would be asked in each type of hiring process would be different, adding another layer of discretion and subjectivity to the process.  (ECF No. 41 at PAGEID ## 1001-1002.)

And that is just at the beginning of the hiring process, before prospective applicants even apply.  As ODJFS correctly observes, there are many more steps in the hiring process, as set forth in the administrative guide, including but not limited to the creation of the answer key, the selection of interviewees, the administration of the hiring tool, and then the consensus scoring.  (ECF No. 42 at PAGEID # 1127.)  Each of the steps set forth in the administrative guide involves a number of variables.  Even though the process may look uniform from the applicants' perspective, it in fact consists of several discrete steps that may, or may not, vary from job opening to job opening and are certainly "capable of separation for analysis" on a case-by-case basis.  *Philips v. Cohen*, 400 F.3d 388, 398 (6th Cir. 2005) (quoting 42 U.S.C. § 2000e-2(k)(1)(B)(i)).  Accordingly, the Court concludes that the administrative guide about which Plaintiff complains is not an "employment practice" for purposes of the first prong of Plaintiff's disparate impact claim.

But even assuming, *arguendo*, that Plaintiff had satisfied the first prong of his prima facie case, his claim would nevertheless fail on the second prong.  While the Court is mindful of

Plaintiff's statistical conclusion that "only 3.08% of management positions at ODJFS are held by African American males," this conclusion is legally insignificant without additional information. As ODJFS correctly points out, the question is not how many African American males hold management positions, it is whether African American males have been disparately impacted by the practice at issue. And Plaintiff has provided no statistical information to that end. In comparable cases, the Sixth Circuit has held that a similar statistical analysis was insufficient:

> The Supreme Court has explained that "the plaintiff must offer statistical evidence of a kind and degree sufficient to **show that the practice in question has caused the exclusion of applicants for jobs or promotions** because of their membership in a protected group."
>
> ***
>
> Plaintiffs' evidence falls short of the relevant statistical data that the law requires. First, it compares the wrong groups of people. **Instead of comparing the employees who actually applied for or were eligible for promotions with those who received them** . . . Plaintiffs compared the proportion of black employees in high-paying positions with the proportion of black employees within the entire MWS workforce.

*Grant v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 446 F. App'x 737, 740-742 (6th Cir. 2011) (emphasis added) (citing *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777 (1988); *see also Philips*, 400 F.3d at 399 ("[T]he relevant inquiry is comparing the number of protected group members benefitting from promotions with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group.") (citing *Connecticut v. Teal*, 457 U.S. 440, 448, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982)). A similar logic holds true here, as Plaintiff should have compared the employees who actually applied for management positions with those who received them. Put differently, if Plaintiff was the fourth African American male to apply for a management position, then 75% of African American male applicants (3 out of 4) would have been hired through the practice; but if Plaintiff had been the one-hundredth African American male to apply for a management position, then only 3% of

African American male applicants (3 out of 100) would have been hired through the practice. Without that kind of statistical information, the Court cannot possibly evaluate whether the practice has any disparate impact.

Accordingly, ODJFS' Motion is **GRANTED** as to Plaintiff's disparate impact claim.

**B.  Count Two: Disparate Treatment**

In order to prevail in an employment discrimination disparate treatment claim, a plaintiff must either present direct evidence of discrimination or rely upon the burden-shifting scheme set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), to create an inference of discrimination. *Allen v. Ohio Dep't of Job & Fam. Servs.*, 697 F. Supp. 2d 854, 881 (S.D. Ohio 2010) (citing *Alexander v. Local 496, Laborers' Int'l Union,* 177 F.3d 394, 402 (6th Cir. 1999)). Here, Plaintiff has not offered any direct evidence of discrimination, and instead expressly proceeds under the *McDonnell Douglas* burden-shifting scheme. (ECF No. 45 at PAGEID ## 1231-1234.)

Accordingly, Plaintiff has the initial burden of establishing a prima facie case. *Singleton v. PSA Airlines, Inc.*, No. 21-3423, 2022 WL 875869, at *3 (6th Cir. Mar. 24, 2022) (citing *McDonnell Douglas*, 411 U.S. at 802). Plaintiffs carry that burden by showing: (1) they are a member of a protected class; (2) they suffered an adverse employment action; (3) they were qualified for the position at issue, and (4) they were treated differently than similarly situated employees who aren't members of the protected class. *Id.* (citing *Chattam v. Toho Tenax Am.*, 686 F.3d 339, 347 (6th Cir. 2012) (citation omitted)). If the plaintiff establishes each element, then the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the plaintiff's adverse employment action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).

11

Then "the burden shifts back to the plaintiff to show pretext—i.e. that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Com.*, 580 F.3d 394, 400 (6th Cir. 2009).

Here, ODJFS concedes for purposes of the briefing that Plaintiff "can make a prima facie case of race discrimination arising from [ODJFS'] selection of Riley for the Grants Administrator position." (ECF No. 42 at PAGEID ## 1131-1132.) Accordingly, the threshold question becomes whether ODJFS can "articulate some legitimate nondiscriminatory reason" for selecting Riley. *McDonnell Douglas*, 411 U.S. at 802. To this end, ODJFS argues that it meets this burden because it hired Riley because she was "deemed the most qualified candidate." (*Id.* at PAGEID # 1132 (citing *Hawkins v. Memphis Light Gas & Water*, 520 F.App'x 316, 319 (6th Cir. 2013) ("Selecting a more qualified candidate constitutes a legitimate, non-discriminatory reason.").) ODJFS argues that Riley received a higher interview score than Plaintiff, both before and after the interviewers re-scored the applicants. (*Id.*)

Plaintiff disagrees, and argues that genuine issues of material fact exist on this issue. (ECF No. 45 at PAGEID ## 1232-1234.) Specifically, Plaintiff argues that it is unclear whether Riley received a higher interview score than Plaintiff before the re-scoring, and stresses that the record is inconsistent with regard to when the interviews were re-scored. (*Id.* at PAGEID # 1232.) Plaintiff argues that "[t]he timing matters to determine whether Wirst and France re-scored the interviews because the high scorer was actually [Plaintiff] and the interviewers decided he was not the candidate they wished." (*Id.*) Plaintiff then argues that these fact issues also go to the issue of pretext, which Plaintiff has the burden of showing should ODJFS articulate a legitimate, nondiscriminatory reason for hiring Riley. (*Id.* at PAGEID ## 1233-1234.) Specifically, Plaintiff argues that "[t]he interviewers contradict one another about the

timing of the scoring, contradict their declarations as to why the interviews were rescored, and Wirt contradicts herself as to her original score for Riley." (*Id.* at PAGEID # 1233.) Plaintiff argues that given all of the inconsistencies in the record, "ODJFS' reason for promoting Riley has no basis in fact, did not actually motivate its conduct, and was insufficient to warrant [Plaintiff's] denial." (*Id.* at PAGEID # 1234.)

In its Reply brief, ODJFS maintains that it met its burden of showing a legitimate, nondiscriminatory reason for hiring Riley, notwithstanding Plaintiff's attacks on the credibility of ODJFS' position. (ECF No. 48 at PAGEID ## 1249-1250 ("For the burden-of-production determination necessarily precedes the credibility-assessment stage . . . . [ODJFS] met its burden by simply proffering an explanation.") (internal quotation marks and citation omitted).) ODJFS also disagrees that fact issues exist as to whether its reason for selecting Riley was pretext for discrimination, arguing that "[t]here are no true issues of fact regarding any of these topics and, even if there were, the issues of timing and Riley's original score for question number three are immaterial." (*Id.* at PAGEID ## 1250-1253.)

The Court disagrees with ODJFS and finds Plaintiff's arguments to be well taken, as there are simply too many factual issues as to whether ODJFS' reason for selecting Riley was pretext for discrimination. First, the Court finds that a jury may well disagree with ODJFS' position that Riley received a higher interview score than Plaintiff before the re-scoring. On this issue, the Court agrees with Plaintiff that the interview scoring sheets for Riley are inconclusive. While there is no dispute that Plaintiff's initial consensus interview score totaled 29.5 (but was miscalculated and recorded as 31.5), ODJFS now submits that Riley's initial consensus interview score totaled 33.5. (ECF No. 42-2 at PAGEID # 1182, ¶ 12.) In reaching 33.5, ODJFS believes that Riley's initial scores for each question were 10, 6.5, 7, 4, and 6. (*Id.*) During Wirt's

13

deposition, however, she could not read her own handwriting to determine what was Riley's score for the third question. (ECF No. 39 at PAGEID # 759 ("Q: What was the score before it was 10? A: It looks like it might have been I guess 5. I can't tell. Maybe 7. Not sure.").)

The Court is not surprised that Wirt could not read her own handwriting during her deposition, as the initial score for the third question of Riley's interview is re-published below in black-and-white and in color (which ODJFS submits is "more legible"):



(ECF No. 39-1 at PAGEID # 819; ECF No. 42-2 at PAGEID # 1194.) While it is clear that the revised score for this question was a 10, the initial score for this question is indisputably unclear. (*Id.*) And, contrary to ODJFS' position, this is a genuine issue of material fact, as it goes directly to whether Riley actually had a higher initial consensus interview score than Plaintiff as ODJFS maintains. If Riley's initial score for this question was 1, for example, then Riley's total initial score would have been 27.5 – below Plaintiff's total initial score. But if Riley's initial score for this question was 5 (as Wirt testified it "might have been"), then Riley's total initial score would have been 31.5 – which would have appeared to equal Plaintiff's total initial score (which was miscalculated and recorded as 31.5). Either instance supports Plaintiff's pretext theory, as both scenarios could lead a jury to concluding that Wirt and France re-scored the interviews so they could establish Riley as the highest scoring candidate. While Wirt ultimately declared that the initial score was a 7, the Court must leave it to a jury to evaluate.

The same can be said for the other fact issues Plaintiff identifies. For example, as Plaintiff correctly observes, Wirt and France disagree as to when they scored the interviews, as Wirt testified that they scored the interviews "as soon as possible" after the interviews and France testified that "[t]hey were scored after the last interview was completed." (ECF No. 45 at PAGEID # 1232 (citing ECF No. 39 at PAGEID # 748 (Wirt testimony), ECF No. 40 at PAGEID # 868 (France testimony)).) The Court finds this to be a genuine issue of material fact, as the actual timing could go to whether Wirt and France inflated Riley's score, as Plaintiff claims. While ODJFS is correct that "mere conjecture" is insufficient to show pretext, Plaintiff's argument is rooted in evidence. (ECF No. 48 at PAGEID # 1251 (citing *Harris v. City of Akron*, 836 F. App'x 415, 421 (6th Cir. 2020)).) Specifically, Plaintiff highlights Wirt's deposition testimony that she and France "tall[ied] the scores and [] look[ed] to see who scored the highest and look – **ensure that that's the candidate that we wish**." (ECF No. 39 at PAGEID # 737 (emphasis added).)

Plaintiff also correctly identifies tension between Wirt and France's testimony as to why they rescored the interview scores in the first place. (ECF No. 45 at PAGEID ## 1232-1233.) On one hand, Wirt testified that they "had gone through . . . and realized that [they] could have done more – [they] could have added – included more – given more points to some of the answers that a candidate had." (ECF No. 39 at PAGEID ## 747-748.) On the other hand, France testified that they "had to have a consensus as to what those scores were, that they were matching scores." (ECF No. 40 at PAGEID ## 894-895.) Again – and especially in light of the foregoing fact-disputes – a jury could look at this evidence and determine that Wirt and France "realized that [they] could have done more" to "ensure that [Riley was] the candidate that [they] wish[ed]" to hire, and that ODJFS' reason for hiring Riley was in fact pretext for unlawful discrimination.

15

The Court expresses no opinion as to the likelihood of such a finding, but simply presents it to appreciate the materiality of these fact disputes.[2]

Accordingly, ODJFS' Motion is **DENIED** as to Plaintiff's disparate treatment claim.

### C. Count Three: Retaliation

To establish a prima facie case of retaliation a plaintiff must establish that: (1) they engaged in a protected activity; (2) their "exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Jones v. Johanns*, 264 Fed.Appx. 463, 466 (6th Cir. 2007))). A retaliation claim can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (citation omitted).

Here, Plaintiff claims that he suffered retaliation for filing the discrimination charge in three ways: first, by Riley denying his request to take a particular training; second, by Riley imposing the earlier deadlines; and third, by Weber's inquiry as to whether Plaintiff had completed a mandatory training. (*See* ECF No. 45 at PAGEID ## 1234-1237.) In the subject Motion, ODJFS concedes that Plaintiff has satisfied the first and second elements of his prima facie case for the retaliation claims arising out of Riley's actions. Nevertheless, ODJFS argues

---

[2] The record compels no other result at this stage, and the Court finds that ODJFS' concerns of any conflict with *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L. Ed. 2d 407 (1993) are unfounded. *Id.* at 501 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

that Plaintiff has only satisfied the first element for his claim arising out of Weber's inquiry. (ECF No. 42 at PAGEID ## 1133-1139.) Accordingly, the Court will begin its analysis at the third element – whether ODJFS took any actions that were materially adverse to Plaintiff.

The "materially adverse action" element of a Title VII retaliation claim is substantially different from the "adverse employment action" element of a Title VII race discrimination claim. *Laster*, 746 F.3d at 719 (citations omitted). For Plaintiff's retaliation claim, he needs only to show "that a reasonable employee would have found the challenged action[s] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* As Plaintiff correctly observes, this is a less onerous burden than in the anti-discrimination context. *Id.* at 331 (citations omitted). If Plaintiff presents sufficient evidence to establish a prima facie case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. Once proffered, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *Id.* at 804.

Against that backdrop, the Court will discuss each of the alleged retaliatory acts in turn.

### 1. Denial of Training

Here, the Court finds that Plaintiff has not produced sufficient evidence to establish a prima facie case of retaliation regarding Riley's denial of Plaintiff's request for a specific training class. Rather, Plaintiff only has demonstrated that he "informed Riley he wanted to continue to advance his career and signed up for this specific training course because it met the requirement to take 25 hours of training classes outside his job duties." (ECF No. 45 at PAGEID # 1235 (citing ECF No. 37 at PAGEID # 251).) Plaintiff also has demonstrated that while the specific training class was outside his typical job duties, it applied to skills that were utilized in

17

the Grants Administrator position to which Plaintiff had applied. (*Id.* at PAGEID # 1224 (citing ECF No. 37 at PAGEID # 254).) But such evidence does not help prove a materially adverse employment action. As the Sixth Circuit recently noted, "[e]ven if the training could help the plaintiff receive future promotion, courts have not found adverse employment actions where the possibility of a promotion is speculative." *Logan v. MGM Grand Detroit Casino*, No. 21-1149, 2021 WL 6932348, at *4 (6th Cir. Dec. 22, 2021) (citing *Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 345 (6th Cir. 2008). To this end, Plaintiff has not provided any evidence to show how "the possibility of a promotion" was anything more than speculative (i.e., than it was anything other than a goal of Plaintiff). Under these circumstances, the Court cannot find that Plaintiff has satisfied the third prong of his prima facie retaliation claim.

Accordingly, ODJFS' Motion is **GRANTED** as to Plaintiff's retaliation claim arising from Riley's denial of Plaintiff's request for a specific training class.

### 2. Imposition of Earlier Deadlines

The Court reaches the same conclusion for Plaintiff's retaliation claim arising from Riley's imposition of earlier deadlines. Specifically, the Court finds that Plaintiff has failed to satisfy the third prong of his prima facie case, as Plaintiff provides no evidence showing how the imposition of earlier deadlines could be materially adverse. Even assuming, *arguendo*, that the new deadlines were "unrealistic" (as Plaintiff submits), the Court of Appeals for the Sixth Circuit also recently noted that "the assignment of job duties—even for more burdensome tasks—does not constitute an adverse action." *Logan*, 2021 WL 6932348, at *5; *see also Moore v. Abbott Lab'ys*, 780 F. Supp. 2d 600, 625 (S.D. Ohio 2011) ("[Defendant] is entitled to summary judgment in its favor with respect to [Plaintiff's] claim that he was subjected to unlawful retaliation in the form of tight deadlines.").

Accordingly, ODJFS' Motion is **GRANTED** as to Plaintiff's retaliation claim arising from Riley's imposition of earlier deadlines.

### 3. Inquiry Regarding Training

The Court reaches the same conclusion for Plaintiff's retaliation claim arising from Weber's inquiry as to whether Plaintiff had completed a mandatory training. As ODJFS correctly points out, "[Plaintiff's] embarrassment over the alleged comment does not make it materially adverse." (ECF No. 42 at PAGEID # 1137.) *See also Moore*, 780 F. Supp. 2d at 621–22 ("Notably, the *Burlington* standard is objective: it measures retaliation from the standpoint of a *reasonable* employee, not one who is unusually sensitive. Thus, [Plaintiff's] subjective assertion that he found these and other circumstances at Abbott humiliating or embarrassing does not give rise to an actionable retaliation claim.") (internal citation omitted).

ODJFS also correctly observes that Plaintiff provided no evidence to satisfy the second, third, or fourth prongs of his prima facie claim, and Plaintiff did nothing in response to rebut that fact. Instead of providing evidence, Plaintiff merely argued that "Weber's inquiry . . . also qualifies as a materially adverse employment action" and "[f]ailing to complete mandatory training is definitely prohibitive to [Plaintiff's] career advancement goals." (ECF No. 45 at PAGEID # 1236.) These arguments are not well taken, especially in the absence of any evidence supporting Plaintiff's claim.

Accordingly, ODJFS' Motion is **GRANTED** as to Plaintiff's retaliation claim arising from Weber's inquiry as to whether Plaintiff had completed a mandatory training.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 42) is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, Defendant's Motion for Summary Judgment (ECF No. 42) is **GRANTED** as to Counts One and Three, and **DENIED** as to Count Two.

**IT IS SO ORDERED.**


Date: March 30, 2022            /s/ *Elizabeth A. Preston Deavers*
ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE